IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| MEINEKE CAR CARE CENTERS, INC., | ) | CIVIL ACTION NO. |
| | ) | _____ |
| Plaintiff, | ) | |
| | ) | **MEINEKE'S MEMORANDUM OF** |
| vs. | ) | **LAW IN SUPPORT OF ITS MOTION** |
| | ) | **FOR A PRELIMINARY** |
| | ) | **INJUNCTION** |
| IGOR DUGLAS, | ) | |
| | ) | |
| Defendant. | ) | |

## I. PRELIMINARY STATEMENT

Meineke's Motion for a Preliminary Injunction arises out of Defendant's refusal to abide by the post-termination obligations contained in his Franchise Agreement and violations of the Lanham Act and common law, thus threatening Meineke with immediate and irreparable harm. Since his termination, Defendant has commenced operation of a competing automotive repair business within a six (6) mile radius of former Center No. 2019. Defendant is using Meineke's trademarked name in conjunction with the operation of this prohibited automotive repair business. Defendant's conduct violates covenants contained in the Franchise Agreement he entered into with Meineke, as well as the Lanham Act and common law. Defendant's unlawful conduct threatens Meineke, its authorized franchisees and the consuming public with immediate and irreparable injury, thus necessitating this Motion for interim relief. Specifically, Meineke requests that the Court enter a Preliminary Injunction directing Defendant to:

> 1. Cease and refrain, for a period of one year from the date he begins compliance with such covenant not to compete, from directly or indirectly (such as through corporations or other entities owned or controlled by him), owning a legal or beneficial interest in, managing, operating or consulting with: any business performing exhaust, brakes, or shocks and struts services within six (6) miles of former Center No. 2019 or within six (6) miles of any other Meineke Center existing as of the date that Center No. 2019 terminated;

2. Cease using and/or remove and/or have removed any names, marks, signs, forms, advertising, manuals, computer software, supplies, products, merchandise and all other things and materials of any kind which are identified or associated with the Meineke name, logo, marks or trade dress, or which contain a name, logo, mark or trade dress confusingly similar to the Meineke name, logo, marks or trade dress.

## II. STATEMENT OF THE FACTS

**A.    The Parties.**

Meineke is a North Carolina corporation with its headquarters in Charlotte, North Carolina.  (Verified Complaint ¶ 1.)  It operates and grants franchises for automotive repair Centers throughout North America.  (Verified Complaint ¶ 9.)  Meineke has over 800 franchises located throughout the United States and parts of Canada.  (Verified Complaint ¶ 51.)  Its relationship with each of its franchisees is governed by a written Franchise and Trademark Agreement.  (Verified Complaint ¶ 19.)  Defendant formerly operated an authorized Meineke Center. (Verified Complaint ¶ 20.)

**B.    Meineke's Trade Name, Marks, Logo, and Trade Dress.**

The tradename "Meineke" is registered with the United States Patent and Trademark Office.  (Verified Complaint ¶¶ 10-12.)  Since 1972, hundreds of millions of dollars have been spent advertising and promoting the Meineke name, logo and marks (hereinafter referred to as the Meineke "Marks").  (Verified Complaint ¶ 13.) As a result, Meineke's Marks have become famous throughout North America, and have developed substantial and valuable goodwill. (Verified Complaint ¶ 14.)  The Meineke Marks and the goodwill associated with them belong to Meineke alone.  (Verified Complaint at Ex. 1, Article 10.1.)

Meineke grants its franchisees a limited license to use and display the Meineke Marks and trade dress during the term of their franchise agreements.  (Verified Complaint at Ex. 1, Article 10.)  Meineke does not, however, authorize its franchisees to use the Meineke Marks or trade

dress following the expiration or termination of their franchises. In fact, Defendant's Franchise and Trademark Agreement specifically provides that: "Upon any termination or expiration, . . . [Defendant] will: (a) not directly or indirectly at any time or in any manner use any Mark, any colorable imitation of any Mark or any other indicia of a Meineke Center." (Verified Complaint at Ex. 1, Article 15.2.)

## C.    Meineke's Franchise Agreement With Defendant.

On or about May 30, 2008, Meineke entered into a Meineke Franchise and Trademark Agreement with Defendant Duglas, which granted him the right to operate a Meineke Center located at 1023 North Monroe Street, Tallahassee, FL ("Center No. 2019"). (Verified Complaint ¶ 20.)

By signing the Franchise Agreement, Defendant acquired the right to use the Meineke Marks and received from Meineke proprietary information and know-how concerning, among other things, training manuals, policy manuals, operations manuals, sales promotion aids, promotional techniques, business forms, accounting procedures, marketing reports, informational bulletins, product development, suppliers' discounts, and inventory systems. (Verified Complaint ¶ 21 and at Ex. 1, Art. 10, 11.) In exchange for those privileges, Defendant agreed to submit accurate weekly business reports showing the gross revenues generated by his Meineke franchised business and to pay a percentage of those gross revenues on a weekly basis in the form of franchise fees and advertising contributions. (Verified Complaint ¶ 23.)

## D.    Defendant's Covenant Not to Compete.

Defendant acknowledged in the Franchise Agreement that various information revealed to him by Meineke concerning its unique and highly successful system for the establishment and operation of undercar repair centers is proprietary and constitutes trade secrets belonging to

Meineke.  (Verified Complaint at Ex. 1, Article 11.)  Defendant also acknowledged and agreed

that, as a result of regular and continuing access to this confidential and proprietary information,

it would be impossible for him to engage in the same business activities following his

termination without using Meineke's confidential and proprietary information.  (Verified

Complaint at Ex. 1, Article 11.4.)  Accordingly, in Article 11 of the Franchise Agreement,

Defendant agreed that for a period of one (1) year after leaving Meineke, he would not "directly

or indirectly (such as through corporations or other entities owned or controlled by him), own a

legal or beneficial interest in, manage, operate or consult with": any business performing

exhaust, brakes, or shocks and struts services at the premises of former Center No. 2019 or

within six (6) miles of former Center No. 2019 or within six (6) miles of any other Meineke

Center  existing as of the date that Center No. 2019's license terminated.  (Verified Complaint at

Ex. 1, Article 11.4.)

**E.**     **Defendant's Defaults Under the Franchise Agreement.**

During his term as an authorized Meineke franchisee, Defendant failed to submit all

required weekly business reports and failed to pay all required weekly franchise fees and

advertising contributions.  (Verified Complaint ¶ 25.)  Meineke sent Defendant a Notice of

Default on March 27, 2009, informing him that if he failed to cure the defaults within thirty days,

his license was subject to termination. (Verified Complaint ¶ 26.)  Defendant failed to timely

cure his defaults, so Meineke sent Defendant a Notice of Termination on September 2, 2009

informing him that his license for Center No. 2019 was terminated effective September 3, 2009.

(Verified Complaint ¶ 28.)  Meineke's Notice of Termination demanded that Defendant comply

with the post-termination covenants as set forth in Articles 11 and 15 of the Franchise

Agreement. (Verified Complaint at Ex. 1.)

**F.**    **Defendant's Breaches of the Post-Termination Covenants.**

Since the termination of the Franchise Agreement, Defendant commenced operation of a competing automotive repair business located within a six (6) mile radius of Meineke franchise Center No. 2019.  (Verified Complaint ¶¶ 32-37 and at Exhibit 5.)  Further, Defendant is using Meineke's trademarked name in the operation of his prohibited competitive automotive repair business.  (Verified Complaint ¶¶ 32-37 and at Exhibit 5.)

**G.**    **Meineke's Motion for a Preliminary Injunction.**

Meineke has instituted arbitration to recover, among other things, the franchise fees and advertising contributions that Defendant owes to it, and to enforce Defendant's post-termination covenants. Meineke's Motion for a Preliminary Injunction asks the Court to protect Meineke from the irreparable injury that it is already suffering as a result of Defendant's conduct. This is the exact relief that Defendant agreed to when he signed the contract with Meineke.  (Verified Complaint at Ex. 1, Article 17.)

## III.  ARGUMENT AND LEGAL AUTHORITIES

**A.**    **The Applicable Legal Standard.**

The legal standard applicable to Meineke's Motion for a Preliminary Injunction is the test set forth in Winter v. Natural Resources Defense Council, Inc., 129 S. Ct. 365, 374-76 (2008); See  The Real Truth About Obama, Inc. v. Federal Election Commission, 575 F.3d 342, 345-47 (4th Cir. Aug. 5, 2009) ("the standard articulated in Winter governs the issuance of preliminary injunctions not only in the Fourth Circuit but in all federal courts").   To obtain a preliminary injunction, Meineke must establish: "'(1) that [it] is likely to succeed on the merits, (2) that [it] is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of

equities tips in [Meineke's] favor, and (4) that an injunction is in the public interest.'" The Real Truth About Obama, 575 F.3d at 346 (quoting Winter, 129 S. Ct. at 375-76).

As demonstrated below, each of these four factors weighs heavily in favor of Meineke's Motion for a Preliminary Injunction.

**B.** **Meineke Is Entitled To An Interim Order Enjoining Defendant's Continued Use Of Meineke's Trademark.**

Article 15 of Defendant's Franchise Agreement states that upon termination of the Agreement, Defendant will "not directly or indirectly at any time or in any manner use any Mark, any colorable imitation of any Mark or any other indicia of a Meineke Center." (Verified Complaint at Ex. 1, Art. 15.2(a).) Despite his contractual obligations, Defendant is using the Meineke's trademarked name in the operation of his prohibited competitive business within a six (6) mile radius of former Center No. 2019. (Verified Complaint ¶ 32.) Defendant's continued use of Meineke's trademarked name confuses customers and threatens Meineke with immediate and irreparable harm.

1. Meineke Is Likely To Prevail On The Merits Of Its Trademark Infringement Claim.

In order to prevail on its trademark infringement claim, Meineke must show that (1) its trademark was used in commerce by Defendant without Meineke's consent and (2) the unauthorized use was likely to cause customer confusion. See Burger King Corp. v. Mason, 710 F.2d 1480, 1491 (11th Cir. 1983), cert. denied, 465 U.S. 1102 (1984). "Proof of actual confusion is not necessary; likelihood is all that need be shown." Opticians Association of America v. Independent Opticians of America, 920 F.2d 187, 195 (3d Cir. 1990).

Here, Defendant is printing Meineke's trademarked name on receipts which he is providing to customers. Defendant's use of Meineke's trademarked name is clearly a use in

6

commerce and is not authorized by Meineke, as Meineke made clear to Defendant in its Notice of Termination, expressly revoking Defendant's right to use its trademarks. Therefore, Meineke satisfies the first prong of the trademark infringement test.

Meineke also satisfies the second prong of the trademark infringement test because Defendant's use of Meineke's trademarked name is likely to cause customer confusion concerning the origin of the goods or services at Defendant's prohibited automotive repair businesses. It is well settled that "continued trademark use by one whose trademark license has been cancelled satisfies the likelihood of confusion test and constitutes trademark infringement." Burger King, 710 F.2d at 1493. In Burger King, 710 F.2d at 1492, the former franchisee continued to use Burger King's trademarks without Burger King's consent after the former franchisee's franchise agreements had terminated. The court held that the former franchisee's unauthorized use of the trademarks in commerce was likely to cause customer confusion and established trademark infringement. Id. at 1493. See S & R Corp. v. Jiffy Lube International, Inc., 968 F.2d 371, 375-376, 379 (3rd Cir. 1992) (where the Third Circuit Court of Appeals determined that the franchisor's motion for preliminary injunction was warranted because the franchisee continued using the franchisor's marks after termination--conduct which was likely to cause customer confusion). See also United States Jaycees v. Philadelphia Jaycees, 639 F.2d 134, 143 (3d Cir. 1981); Professional Golfers Ass'n of America v. Bankers Life & Casualty Co., 514 F.2d 665, 670 (5th Cir. 1975).

Meineke has a duty to the public and its franchisees to ensure the consistency of the trademarked automotive repair services. In Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc., 874 F.2d 431, 435 (7th Cir. 1989), the Seventh Circuit Court of Appeals stated:

> The purpose of a trademark, after all, is to identify a good or
> service to the consumer, and identity implies consistency and

> a correlative duty to make sure that the good or service really
> is of consistent quality, i.e., really is the same good or service.
> If the owner of the trademark has broken off business relations
> with a licensee he cannot ensure the continued quality of the
> (ex-) licensee's operation, whose continued use of the
> trademark is therefore a violation of trademark law.

Accordingly, Defendant's unauthorized use of Meineke's trademarked name and his contractual obligations to cease using the trademarks demonstrate that Meineke is likely to succeed on the merits of its trademark infringement claim against Defendant.

      2.    <u>Meineke Will Be Irreparably Harmed If Defendant's Continued Use of Meineke's Trademarks Is Not Enjoined</u>.

Defendant's continued unauthorized use of Meineke's trademarked name threatens Meineke, its authorized franchisees, and the consuming public generally with immediate and irreparable harm. Because Defendant is offering the same services offered when he was an authorized Meineke franchisee, consumers will be deceived into identifying those products and services with Meineke.

Meineke and its authorized franchisees suffer irreparable harm in the form of lost customers and corresponding lost sales due to Defendant's continued use of Meineke's trademarked name. It is impossible as a practical matter to accurately calculate these losses, and therefore the harm to Meineke and its authorized franchisees is irreparable. <u>See Duct-O-Wire Co. v. U.S. Crane, Inc.</u>, 31 F.3d 506, 509-10 (7th Cir. 1994) (in affirming the district court's grant of the plaintiff's motion for a preliminary injunction, the Seventh Circuit Court of Appeals stated: the "irreparable harm is that [Franchisor] will lose sales and the opportunity to maintain and develop relationships with existing and potential customers").

The Fourth Circuit Court of Appeals has recognized that "irreparable injury regularly follows from trademark infringement." <u>Lone Star Steakhouse & Saloon, Inc. v. Alpha of</u>

Virginia, Inc., 43 F.3d 922, 939 (4th Cir. 1995) (affirming district court's granting of preliminary injunction). Other courts agree. See Wynn Oil Co. v. American Way Service Corp., 943 F.2d 595, 608 (6th Cir. 1991) (in affirming the district court's grant of a preliminary injunction, the Sixth Circuit Court of Appeals recognized that continuous infringement demonstrates irreparable harm); Church of Scientology International v. Elmira Mission of the Church of Scientology, 794 F.2d 38, 43 (2d Cir. 1986) (in reversing the district court's denial of a preliminary injunction, the Second Circuit Court of Appeals observed: "[A] licensor who establishes a likelihood of confusion as to product source in a trademark infringement suit simultaneously demonstrates the requisite irreparable harm essential to obtaining a preliminary injunction"). Defendant's unauthorized use of Meineke's trademarked name invariably threatens injury to the goodwill and reputation associated with Meineke's trademark, and thus satisfies the irreparable harm requirement essential to obtaining a preliminary injunction.

     3.     <u>The Irreparable Harm To Meineke Outweighs Any Potential Harm To Defendant</u>.

As demonstrated above, should Defendant be permitted to continue to infringe upon Meineke's trademarks, the harm to Meineke would be immediate and irreparable. Defendant, on the other hand, will suffer little, if any harm. Further, any harm that Defendant may suffer would be a result of his own conduct in failing to pay all of his franchise fees and advertising contributions and does not justify allowing Defendant to continue palming off and infringing upon Meineke's trademarks. Courts have uniformly held in franchisor-franchisee cases that such "self-inflicted harm is far outweighed by the immeasurable damage done [the franchisor] by the infringement of its trademark." S & R Corp. v. Jiffy Lube International, Inc., 968 F.2d 371, 379 (3rd Cir. 1992). See Burger King Corp. v. Majeed, 805 F. Supp. 994, 1006 (S.D. Fla. 1992) ("Any harm suffered by defendants was brought about by their own actions in refusing to pay

their contractual obligations to [the franchisor]. Defendant's self-inflicted harm is far outweighed by the immeasurable damage done [franchisor] by the infringement of its Marks.").

    4.   <u>The Issuance Of A Preliminary Injunction Serves The Public Interest.</u>

"In a trademark case, the public interest is 'most often a synonym for the right of the public not to be deceived or confused.' . . . Where a likelihood of confusion arises out of the concurrent use of a trademark, the infringer's use damages the public interest." <u>S & R Corp.</u>, 968 F.2d at 379 (quoting <u>Opticians Ass'n of America v. Independent Opticians of America</u>, 920 F.2d 187, 197-198 (3rd Cir. 1990)). Thus, like irreparable injury, harm to the public interest necessarily flows from trademark infringement.

Furthermore, "[t]he objectives of the Lantham Act are to protect both the trademark and the public." <u>Downtowner/Passport International Hotel Corp. v. Norlew Inc.</u>, 841 F.2d 214, 220 (8th Cir. 1988); <u>See</u> <u>U.S. Jaycees v. Philadelphia Jaycees</u>, 639 F.2d 134, 142 (3rd Cir. 1981) ("the Act's objective is the protection of the trademark and the public"). Defendant's continued use of Meineke's trademarks is likely to confuse consumers. Accordingly, an Order enjoining Defendant's unlawful conduct promotes the public interest. Because Meineke has satisfied the four factors for obtaining a preliminary injunction, this Court should enter a Preliminary Injunction to prevent Defendant from continuing to infringe upon Meineke's trademarks.

**C.**     <u>**Meineke Is Entitled To An Interim Order Enjoining Defendant's Breaches Of The Contractual Covenant Not To Compete.**</u>

Article 11.4 of Defendant's Franchise Agreement provides that, upon termination of the Franchise Agreement and for a period of one (1) year thereafter, Defendant will not "directly or indirectly (such as through corporations or other entities owned or controlled by them), own a

legal or beneficial interest in, manage, operate or consult with": any business performing exhaust, brakes, or shocks and struts services at the premises of former Center No. 2019 or within six (6) miles of former Center No. 2019 or within six (6) miles of any other Meineke Center existing as of the date that Center No. 2019 terminated. Nothing contained in the Franchise Agreement restricts Defendant's ability to own or operate an automobile repair Center that sells products and/or services other than the specific automobile exhaust, brake, and shocks and struts services that they sold while he was an authorized Meineke franchisee. Likewise, prevents Defendant from starting his own automotive repair business outside of the 6-mile covenanted area. Instead he has chosen a sight within the restricted territory. As demonstrated below, Meineke is entitled to a Preliminary Injunction enjoining Defendant from violating this contractually agreed upon covenant.

1. Meineke Is Likely To Succeed On The Merits Of Its Claim For Enforcement Of The Covenant Not To Compete.

In order to demonstrate the requisite likelihood of success on the merits, Meineke must show that it is likely to be able to prove that the non-competition agreement is valid and enforceable. Increasingly, the franchise relationship has been treated as a sale of the franchisor's goodwill for a limited duration to a franchise. In Domino's Pizza, Inc. v. El-Tan, Inc., 1995 WL 367893 at *1, (N.D. Okla. Apr. 28, 1995) (unpublished) (copy attached), the United States District Court for the Northern District of Oklahoma found that the franchise agreements between parties constituted "a sale of [the franchisor's] goodwill for the duration of the franchise agreements." At least one North Carolina court has followed the reasoning used by the Domino's court, stating that the case "likens the termination of a franchise relationship to a sale of a business and strengthens the analogy between the sale of business covenants examined and upheld in North Carolina and the covenants at issue in franchise agreements." Baskin-Robbins,

Inc. v. Golde, No. 5:99CV102-BR(3), Order at p. 11, n.5 (E.D.N.C. May 26, 2000) (unpublished) (copy attached).  Indeed, the North Carolina Court of Appeals has indicated that a franchisor may have broader interests to protect than an employer.  Manpower of Guilford County, Inc. v. Hedgecock, 42 N.C. App. 515, 523, 257 S.E.2d 109, 115 (1979).

In conjunction with the sale of a business, a covenant not to compete is enforceable in North Carolina if: 1) it is reasonably necessary to protect the legitimate interests of the person seeking its enforcement; 2) it is reasonable with respect to both time and territory; and 3) it does not interfere with the interest of the public. Bicycle Transit Authority, Inc. v. Bell, 314 N.C. 219, 226, 333 S.E.2d 299, 303-304 (1985); Jewel Box Stores Corp. v. Morrow, 272 N.C. 659, 662-63, 158 S.E.2d 840, 843 (1968).

Meineke satisfies the first prong of the test because its non-compete covenant is necessary to protect multiple valid business interests of Meineke.  At the time that a franchisee purchases his franchise, he is on notice that in exchange for his being able to receive the benefits of participating in the Meineke system, he is expected to abide by the in-term and post-termination covenants not to compete.  In Article 11, Defendant specifically recognized the substantial value of the confidential and proprietary information that they received from Meineke under the Franchise Agreement.  Moreover, Defendant availed himself of those benefits.  From a practical standpoint, the franchisee receives training, an operations manual, operational support, advertising, and marketing assistance, and a protected territory in which to develop a successful Meineke Center.  By signing the Franchise Agreement, Defendant took advantage of the unique Meineke system.

Additionally, Defendant was able to take advantage of the large customer pool created through the strong Meineke name.  If a franchisee no longer is a member of the Meineke chain,

then permitting him to compete in the territory where his Meineke franchise operated directly against an existing or new franchisee would enable him to use the information he acquired from Meineke to direct business away from Meineke. In North Carolina, courts have found that these very interests are valid interests that warrant protection by use of a non-compete covenant. In Baskin-Robbins, Inc. v. Golde, No. 5:99CV102-BR(3), Order at p. 11, n.5 the Court articulated these protectible interests to be the following: 1) protection of the franchisor's goodwill in the market place; 2) protection of the business methods conveyed to the franchisee; 3) protection against customer confusion; 4) prevention against breakaway franchisees; and 5) protection of the investments made by other franchisees who had also signed agreements containing covenants not to compete. After reviewing numerous cases that analyze non-compete covenants in the franchising context, the Court enforced the non-compete covenant at issue against the franchisee. Id. at p. 12.

The covenant is also reasonable as to time and territory, which satisfies the second prong of the sale of a business context test. The term is only for one year. North Carolina's courts regularly uphold covenants for periods in excess of one year. See, e.g., Triangle Leasing Co., Inc. v. McMahon, 327 N.C. 224, 229, 393 S.E.2d 854, 858 (1990) (two-year period upheld); Whittaker General Medical Corp. v. Daniel, 324 N.C. 523, 525-26, 379 S.E.2d 824, 826 (1989) (two-year period upheld); United Laboratories, Inc., 322 N.C. at 645-46, 653, 370 S.E. 2d at 378, 382 (eighteen-month restriction upheld); Bicycle Transit Authority, Inc. v. Bell, 314 N.C. 219, 226, 333 S.E.2d 299, 304 (1985) (seven year, two county covenant upheld). In addition, covenants in excess of one year that are contained in franchise agreements have been routinely upheld by other federal courts. See, e.g., Grease Monkey Int'l, Inc. v. Watkins, 808 F. Supp. 111, 118, 120 (D. Conn. 1992) (two-year term upheld); Novus Franchising, Inc. v. Taylor, 795

F. Supp. 122, 128, 132-33 (M.D. Pa. 1992) (two-year term upheld); <u>Carvel Corp. v. Eisenberg</u>, 692 F. Supp. 182, 186 (S.D.N.Y. 1988) (three-year term upheld); <u>Gold v. Holiday Rent-A-Car Int'l, Inc.</u>, 627 F. Supp. 280, 285 (W.D. Mo. 1985) (two-year term upheld).

In determining whether the territorial limitation is reasonable, courts look to whether the limitation is reasonably required to secure the protection of the franchisor's legitimate business interests. <u>Triangle Leasing Co.</u>, 327 N.C. at 228, 393 S.E.2d at 857. The covenant at issue here is reasonable because it does no more than necessary to protect Meineke from terminated franchisees who use the very information provided to them by Meineke in order to sell the very products and services that Meineke has developed in a particular market, and that consumers in that market have come to associate with Meineke. This covenant is necessary to allow Meineke: (1) to protect its confidential and proprietary information and its customer goodwill (customer goodwill is for the trademark and not the specific business), <u>Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc.</u>, 143 F.3d 800, 806 (3rd Cir. 1998) ; and (2) to protect its authorized franchisees in the same area as Defendant, including the new franchisee in Center No. 2019, from unfair competition with an ex-franchisee who has learned all of the confidential practices and procedures that make Meineke Centers successful in the marketplace. In short, the enforcement of these covenants is essential to the viability of Meineke's franchise system.

Courts have recognized that the franchise itself is a legitimate interest sufficient to warrant the need of a covenant not to compete for protection. <u>Piercing Pagoda, Inc. v. Hoffner</u>, 351 A.2d 207, 211 (Pa. 1979) (citing <u>Williams v. Shrimp Boat, Inc.</u>, 191 S.E. 2d 50 (Ga. 1972)); <u>Shakey's, Inc. v. Martin</u>, 430 P.2d 504, 510 (Id. 1967); <u>McDonald's System, Inc. v. Sandy's, Inc.</u>, 195 N.E. 2d 22, 29 (Ill. App. Ct. 1963). <u>See Tutor Time Learning Centers, LLC v. Larzak, Inc.</u>, Slip Copy, 2007 WL 2025214 at * 11 (N.D. Ind. July 6, 2007) (copy attached) (where, even

though the former franchisee claimed that the non-compete covenant was unenforceable because there were no other Tutor Time franchisees anywhere nearby, the court found that the franchisor had a protectable interest in its need to be able to re-franchise the area where the former franchisee's business was located and held that the former franchisee breached the non-compete covenant by continuing to operate a similar business in the same location as its former franchise). These cases all recognize that the basic product the franchisor has to sell is the franchise itself, which typically includes a detailed system of doing business not readily available through independent means. With full disclosure, the franchisee secures those benefits from the franchise system and in exchange agrees to the covenant not to compete effective upon termination of the franchise license. Piercing Pagoda, 351 A.2d at 211.

The territorial restriction at issue in this case is six miles from Center No. 2019. North Carolina courts have enforced covenants not to compete with far broader territorial restrictions than those at issue in this case. For example, in Forrest Paschal Mach. Co. v. Milholen, 27 N.C. App. 678, 687, 220 S.E. 2d 190, 197 (1975), a territorial restriction of 350 miles was enforced.

In Meineke Discount Muffler v. Jaynes, 999 F.2d 120, 123-24 (5th Cir. 1993), the United States Court of Appeals for the Fifth Circuit held that Meineke's covenant not to compete contained in its Franchise and Trademark Agreement was necessary to protect its legitimate business interests, including Meineke's goodwill with its customers. Jaynes involved a former Meineke franchisee who violated his contractual covenant not to compete by continuing to operate an exhaust and brake repair center in the same location as his previous Meineke franchise. Id. at 122. Meineke's requested relief was granted at trial, and was subsequently upheld by the Court of Appeals. In its opinion, the Fifth Circuit Court of Appeals concluded:

> The restraints [contained in Meineke's covenant not to compete] were reasonable considering Meineke's legitimate business interests. The

district court found that Meineke expended considerable resources to promote name recognition for products and services being offered by its franchises. . . . [W]e conclude that the restrictions placed on the Jaynes under the licensing agreement "do not impose a greater restraint than necessary to protect the goodwill or other business interest of [Meineke]."

Id. at 123-124 (quoting Tex. Bus. & Com. Code § 15.50 (Supp. 1993)).

Finally, Meineke satisfies the third prong of the sale of a business context test because the enforcement of this covenant does not violate public policy. North Carolina's courts have often held that covenants not to compete significantly broader than the one here do not violate public policy. See, e.g., Triangle Leasing Co., Inc., 327 N.C. 224, 393 S.E.2d 854; Whittaker General Medical Corp., 324 N.C. 523, 379 S.E.2d 824; United Laboratories, Inc., 322 N.C. 643, 370 S.E.2d 375. Accordingly, Meineke has established that it is likely to succeed on the merits of its claim for enforcing the covenant not to compete. Indeed, Meineke's 6-mile non-compete covenant has been held valid and enforceable through an arbitration between Meineke and former franchisees and the arbitrator's order was confirmed by the Western District of North Carolina, who ordered the former franchisees to comply with the non-compete covenant. See Meineke Car Care Centers, Inc. v. Bell Enterprises, LLC, et al, No. 3:06-CV-281-MU, Order and Judgment (W.D.N.C. Jan. 15, 2008) (unpublished) (copy attached).

    2.    <u>Meineke Will Be Irreparably Harmed Absent The Interim Enforcement Of Defendant's Covenant Not To Compete</u>.

As Defendant acknowledged in the Franchise Agreement, Meineke provided him with valuable knowledge, training and confidential and proprietary information enabling him to establish and operate an automotive repair center throughout the term of his relationship with Meineke. Additionally, Defendant acknowledged that he would not be in a position to operate a

competing exhaust, brake, and shocks and struts repair center following termination by Meineke without taking advantage of Meineke's know-how and training.

In the wake of Meineke's termination of Defendant's franchise for cause, one of Meineke's top priorities is to re-establish an authorized Meineke Center in order to retain its goodwill and market share in the market that was formerly served by Defendant. (Verified Complaint ¶ 42.) Meineke has successfully re-established Center No. 2019. Permitting Defendant now, following his own repeated breaches of the Franchise Agreement and self-inflicted termination, to violate the covenant not to compete and to use the Meineke know-how and training to establish his own automotive repair center within the restricted territory would be both grossly unfair and extremely injurious to Meineke and the new franchisee located in Center No. 2019. It would deprive Meineke of the customers and the market that it has established over the course of its franchise relationship with Defendant, and it would burden the new franchisee in Center No. 2019 with authorized and unfair competition.

Moreover, permitting Defendant to ignore and violate contractually the agreed upon covenant not to compete would adversely affect the value of all other legitimate, law abiding Meineke franchisees, thus harming the Meineke system as a whole. If a terminated franchisee were allowed to operate a competing Center within the covenanted geographical area and to continue to use the knowledge, training and confidential and proprietary information that he gained from Meineke, he would unfairly achieve a significant competitive advantage over all of the legitimate Meineke Centers in his area, without having to pay for the privilege of using Meineke's confidential and proprietary know-how. As Judge Voorhees stated in <u>Meineke Discount Muffler Shops, Inc. v. Vaghani</u>, No. 3:99CV255-V, Order and Preliminary Injunction, at 3-4 (W.D.N.C. Sept. 22, 1999) (unpublished) (copy attached), "[a]llowing Defendant to

operate a competing automotive business in violation of this covenant allows Defendant to compete unfairly with Plaintiff, thereby causing irreparable harm." This would have a chilling effect on potential buyers of Meineke franchises in the covenanted area from purchasing a Meineke franchise, thus reducing the value of those franchises. In granting the plaintiff its right to enforce its non-compete covenant in a similar case, the Court in Meineke Discount Muffler Shops, Inc. v. Smith, Bus. Franchise Guide (CCH) ¶9883 (N.D. Ill. 1991) (copy attached), reasoned that:

> Meineke will suffer further irreparable harm if the Smiths are allowed to continue to sell and service exhaust [com]ponents, brakes and shocks at their shop because the Smiths are then unfairly competing with Meineke franchisees in the Chicago area in that they are utilizing for free all of the valuable and proprietary information received from Meineke in order to operate their repair facility. Consequently, the Smiths are in a position to offer services at their repair facility for a lower price than Meineke franchisees because they are not paying to Meineke any royalty premiums or making any advertising contributions.

In Domino's Pizza, Inc. v. El-Tan, Inc., 1995 WL 367893 at *3, the court stated that "[w]ithout injunctive relief, [the franchisor] would suffer irreparable harm due to its inability to attract new franchisees to the area now serviced by [the terminated franchisee]." Additionally, the franchisor will likely suffer further irreparable harm due to customer confusion caused by the former franchisee operating the same type of business from the former franchise location. Id. Thus, permitting Defendant to continue violating the covenant not to compete would reduce the value of Meineke's franchises, irreparably harming Meineke's authorized franchisees and threatening Meineke's on-going relationship with its authorized franchisees. Accordingly, unless Defendant is enjoined from violating the covenant not to compete, Meineke and its authorized franchisees will suffer immediate and irreparable harm.

Finally, if Defendant is allowed to violate the covenant not to compete contained in the Franchise Agreement, then other franchisees will be tempted to leave the franchise system after they have been afforded the opportunity to gain the benefit of the knowledge and training provided by the system. See e.g., Jiffy Lube Int'l., Inc. v. Weiss Brothers, Inc., 834 F. Supp. 683, 693 (D.N.J. 1993) (granting the plaintiffs' motion for a preliminary injunction in part based on not wanting to send the message that other franchisees could get away with violations of their franchise agreements). This is much more likely if franchisees believe they can do so with impunity, believing the Court will not hold them to their contractually agreed covenant not to compete. Allowing franchisees to violate the covenant not to compete likely would have the devastating effect of franchisees leaving the Meineke system, leading to the eventual unraveling of that system. This result would not only cause irreparable harm to Meineke, but would also cause irreparable harm to the Meineke system as a whole and the hundreds of innocent Meineke franchisees whose businesses would suffer a tremendous loss of value from such occurrence.

In the case of ATL International, Inc. v. Baradar, Bus. Franchise Guide (CCH) ¶11,345 (D. Md. 1997) (copy attached), the franchisor sought enforcement of a two-year, ten mile post-termination covenant not to compete through a preliminary injunction. In granting the preliminary injunction, the judge stated:

> I have no doubt that the plaintiff would suffer irreparable harm if I were to deny the preliminary injunction. As cases say, it is the franchise system itself that is at issue. I do not take it as a parade of horribles argument at all. I think it is very realistic to expect that if a franchisee simply were to stop paying fees or stop other things that were due and then, after having operated under the franchise name for several years, were simply to then say okay, I'm breaking away, I'll stop using the various things that I've received as a franchisee and will go out on my own, that that would be a clear signal that other franchisees could do the same....I have little doubt that my failure to grant the injunction here might unravel the franchise system....Of course, Mr. Baradar is going to suffer harm because I am granting the

> injunction. He is not going to be able to do this kind of business within ten miles of where he is doing it now for two years, but that is exactly what he contracted for.

Id.

   3.   The Irreparable Harm To Meineke Outweighs Any Potential Harm To Defendant.

Any harm resulting to Defendant from the requested injunction would be entirely self-inflicted. The Franchise Agreement for Center No. 2019 was terminated because of Defendant's own breaches of the agreement. Moreover, Defendant specifically agreed to the covenant at the very outset of his franchise relationship with Meineke. It would be unjust to allow Defendant to violate his covenant because it would permit him to benefit unfairly from the confidential marketing and operational information that Meineke previously provided to him as part of the parties' franchise relationship. See, e.g., KFC Corp. v. Duncan, Bus. Franchise Guide (CCH) ¶ 8924 (W.D. Ky. 1987) (copy attached).

Meineke's covenant against competition only prohibits Defendant from selling a limited and specific set of products and services within the covenanted area and term, not all automobile repair products and services. Accordingly, the significant harm that would result to Meineke and its authorized franchisees if Defendant were allowed to violate this covenant outweighs any harm to Defendant from enforcement of this agreed upon covenant.

   4.   The Issuance Of A Preliminary Injunction Serves The Public Interest.

The public derives substantial benefit from the services provided by those who, like Meineke, train entrepreneurs and develop new businesses. Communities benefit from the variety, competition and quality of products and services made available to them through the efforts of franchisors such as Meineke. Franchisees are provided with professional training, skills and the promotional advantages of a recognized trade name, which enable them to

establish their own businesses at a fraction of the cost of beginning from scratch. If franchisors such as Meineke are unable to protect themselves and their systems from those who would take unfair advantage of the benefits of exposure to a franchised system, Meineke and other franchisors may be forced to alter their way of doing business, to the detriment of the consuming public. In addition, if this covenant is not enforced, Defendant will continue to mislead the public, unfairly compete with Meineke's authorized area franchisees, unfairly capitalize on Meineke's trade secrets and unfairly piggyback on Meineke's goodwill. See S & R Corp., 968 F.2d at 379. Finally, if individuals can enter into contracts and disregard the terms they do not like with impunity, then the sanctity of the contractual relationship will be severely undermined. The enforcement of Meineke's contractual covenant sanctifies and continues to support the fundamental contractual arrangement between the parties. Accordingly, Meineke has satisfied the four factors for obtaining a preliminary injunction and this Court should enter a Preliminary Injunction preventing Defendant from continuing to violate the non-competition clause in his Franchise Agreement.

## IV. CONCLUSION

Defendant entered into the Franchise Agreement for Center No. 2019 fully aware of the terms. Defendant then violated those terms, causing termination as a franchisee, and thereafter violated the post-termination provisions of the Franchise Agreement. Defendant's present conduct threatens irreparable harm to Meineke by confusing consumers and damaging Meineke's goodwill. Defendant's activities also violate the Franchise Agreement, the Lanham Act, and the common law. Accordingly, Meineke respectfully prays that the Court enter a Preliminary Injunction against Defendant as set forth at the beginning of this Memorandum.

Respectfully submitted this 26th day of January 2010.

s/ Todd W. Billmire
Todd W. Billmire
N.C. State Bar No. 34431
Amy K. Reynolds
N.C. State Bar No. 21266
Attorneys for Plaintiff
Meineke Car Care Centers, Inc.
128 South Tryon Street, Suite 900
Charlotte, NC 28202
Telephone: (704) 644-8105
Fax: (704) 358-4706
E-mail: todd.billmire@meineke.com